IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Brent Allen Fiori, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 12 CV 50148 |
| | ) Honorable Iain D. Johnston |
| Carolyn W. Colvin, | ) U.S. Magistrate Judge |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The Claimant brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for both disability insurance benefits and supplemental security income payments under the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. (Dkt. #15, 20, 21).

The Claimant argues that the Commissioner's decision denying his application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law.[2] The Commissioner argues that the

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

[2] The Court notes that Claimant's memorandum in support of his motion for summary judgment is missing page 3. Dkt. #15. Because the memorandum purports to be just over four pages long, the absence of the page and any arguments contained therein results in a substantial loss. Neither Defendant nor Plaintiff made note of the missing page in their subsequent filings.

ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth more fully below, the Claimant's motion for summary judgment is denied, and the Commissioner's motion is granted.

## I. BACKGROUND

A. Procedural History

The Claimant filed an application for disability on October 25, 2005, alleging a disability onset date of September 26, 2005, due to being bi-polar and suffering from back pain. R. 106, 123. On February 10, 2006, the application was denied. R. 70. The Claimant filed a timely request for a hearing on May 31, 2006. R. 89. The ALJ conducted a hearing on November 7, 2007 in Evanston, Illinois. R. 11. The Claimant and Vocational Expert William Newman testified at the hearing. R. 15 – 38, 38 - 53.

On November 28, 2007, the ALJ issued a decision denying the claim for benefits. R. 58. On December 7, 2007, the Claimant filed a timely request to review the ALJ's decision, which apparently was misplaced. R. 8-9. On November 11, 2009, nearly two years later, Claimant's counsel contacted the Appeals Council, seeking a status of the appeal. R. 8. Two-and-a-half years later, on March 20, 2012, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner. R. 1. Thereafter, on April 30, 2012, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g). Dkt. #1. This matter was transferred to the undersigned on May 3, 2013. Dkt. #25.

B. Hearing Testimony

1. Claimant

Counsel represented the Claimant at his hearing on November 7, 2007. R. 11. At that hearing, the Claimant testified to the following.

The Claimant was 47 years old at the time of the hearing. R. 15. The Claimant was a high school graduate, and attended some college. The Claimant testified that his earnings began to decrease in about 2004 because his problems were progressive. R. 16, 22.

The Claimant testified that his previous employment included work as a machinist, during which time, he would be required to lift anywhere between 20 and 50 pounds often. R. 17. The Claimant also worked on plastic injection machines, which involved faster work and constant lifting of up to 50 pounds. R. 18-19. The Claimant also worked as a night stock supervisor, which was manual work that required repetitive kneeling, bending, twisting and pushing. R. 19. Additionally, the Claimant worked as a bartender, serving drinks and stocking the bar, including changing kegs. R. 20. For a beverage distribution company, the Claimant made deliveries and loaded and unloaded trucks. R. 21. He also worked as a line cook. R. 22.

The Claimant testified that his lower back hurt as a result of a previous vehicle accident. R. 23. The Claimant described the feeling as if a knife was going through his hips and as if a "giant hand [was] squeezing the air out of [his] lungs." R. 23. According to the Claimant, the pain level was a nine on a ten point scale.

However, the Claimant admitted that the pain did not travel down his legs and that he only took ibuprofen and aspirin for the pain. R. 23-24.

To alleviate the pain, the Claimant said that would consistently have to lay on the floor for 15 – 20 minutes at random times throughout the day. R. 24. He would lay down 4 – 5 times a day. R. 30. He claimed to be able to walk or stand for only 10 – 15 minutes at a time and if seated, needed to adjust his position every 10 – 15 minutes. R. 24. Similarly, the Claimant asserted that he avoided lifting anything greater than 5 pounds "at all costs." R. 25.

According to the Claimant, he slept very little, and that when he was awake he would just walk around the house, lay on the floor and stretch. R. 25. He described these activities as "shuffling around the house." R. 32. At the hearing, the Claimant testified that his mother shopped for him and did his laundry. R. 25. Also during the hearing, the Claimant asserted that he had not driven, shopped or done laundry for over two years. R. 26. According to the Claimant, he hardly ever left the house. R. 26. In fact, the Claimant testified he went days without leaving the house. R. 33. He said he did not like being around people. R. 34.

The Claimant testified to his manic-depression, for which he was taking medication; namely 80 milligrams of Geodon every day for a year and a half. R. 26 – 27. According to the Claimant, his concentration was affected. R. 27. For example, the Claimant testified that when he was watching television, he could not always remember what he was watching. R. 31. According to the Claimant, he

would have highs and lows that would last for weeks.  R. 33.  But he admitted that his medication "even[ed] it out a little bit."  R. 34.

The Claimant testified that he was previously a member of an Italian men's social club, but he did not renew his membership.  R. 28.

The ALJ questioned the Claimant regarding notations in the record regarding allegations of past cocaine and alcohol use.  R. 35 – 37.  The Claimant testified that he did not use cocaine at all and very rarely had a beer.  R. 35.  In fact, the Claimant "guaranteed" the ALJ that he had not used cocaine in over 5 years.  R. 36.  When the ALJ confronted the Claimant with the records showing that he said he had used cocaine within the previous 5 years, the Claimant asserted that the records were incorrect and speculated that the counselor who wrote the information was retaliating against him for filing a grievance against her.  R. 36 – 37. Additionally, when questioned about why the Claimant's long standing problems did not prevent him from working until 2004, the Claimant testified that he "tried to work through a lot of that stuff."  R. 38.

2. Vocational Expert

A vocational expert, William Newman, also testified at the hearing.  R. 38 – 53. Initially in his testimony, Mr. Newman characterized and categorized the Claimant's prior work history.  R. 39 – 42.  According to Mr. Newman, the Claimant had no transferable skills and could not perform his past relevant work.  R. 44, 45.

Eventually, the ALJ asked Mr. Newman if jobs existed under the following circumstances:  the work was sedentary, with no repetitive bending, twisting or

carrying above ten pounds; the work was unskilled, routine, repetitive, and involved

little judgment and only infrequent interaction with others; and the work was

limited based upon the GAFs assigned to the Claimant in the record.  R. 47.

According to Mr. Newman, thousands of unskilled sedentary level work existed in

the Chicago/Rockford area, including bench assemblers.  R. 47.  However, no jobs

would exist if the hypothetical person also needed to lay down four to five times a

day at unpredictable times for up to 15 minutes each time.  R. 48.

C. Medical Evidence

Three sets of relevant medical records exist in this matter, although neither

set is very extensive.  One set of medical records relate to the Claimant's back

problems.  Nearly all of these records are from the Claimant's chiropractor, Dr.

Michael Papke.  The other set of medical records relate to the Claimant's mental

condition.  The documents relating to his medical condition were created by various

mental health professionals at the Janet Wattles Center.  The final set of records

was created by the state-agency consultants.

1. Medical Records Relating to Lumbar Degenerative Disc Disease

With regard to the Claimant's back problems and pain, the record contains

documents from Dr. Michael Papke. R. 202-220.  But only a few of these documents

are dated around the alleged onset date.  And these documents are not very

detailed, generally just stating that the Claimant had low back pain or similar

complaints.  R. 219.  The record also contains a November 30, 2005 letter that the

Claimant had "many episodes of low back pain due to degenerative disc in the

lumbar spine." R. 236. According to the letter, Dr. Papke had seen the Claimant

five (5) times in the previous six (6) months. R. 236. Dr. Papke indicated that most

of the Claimant's pain occurred at the L4-5 levels. R. 236. The letter concluded by

stating the Claimant "responds well to treatments and exercise" and "[h]e is treated

on an add [sic] needed basis." R. 236. Finally, also included in the record was a

"return to work" form for the Claimant, dated February 27, 2006, which stated the

Claimant could return to light work, but was restricted to "no repetitive bending,

twisting, or lifting of anything greater than 5 lbs." R. 270. No further information

was provided.

### 2. Medical Records Relating to Bipolar Disorder

On October 6, 2005, an initial assessment (screening) was created by Jennifer

Schmidt of the Janet Wattles Center. R. 224-28. The document indicated that the

Claimant was suffering from periods of depressed mood, feeling hopeless as well as

periods of increased energy and irritability. R. 224. The Claimant's chronic back

pain was noted. R. 224. As to drug and alcohol use, the October 6, 2005 assessment

indicated that the Claimant used alcohol two (2) to three (3) times a week, and

cocaine once a month – the most recent use being the previous week. R. 225. The

assessment included a "mental status exam" that indicated that the Claimant's

mood was depressed. R. 226. Similarly, the Claimant had suicidal thoughts but no

plan or intent. R. 226. This assessment provided the Claimant with a GAF of 50.

R. 227.

On October 28, 2005, a second assessment was created by Lynn Pollock of the Janet Wattles Center. R. 229-33. This assessment indicated that the Claimant has been having mood swings for most of his life, but never previously treated for mental illness. He described his periods of highs and lows. R. 229. According to this document, "[The Claimant] . . . admits to using cocaine and his last use was two weeks ago. He also reports that he drinks beer." R. 229. This assessment stated that the Claimant last used cocaine two (2) weeks previously, that he used cocaine on the weekends, but that the Claimant was vague and defensive about his use of cocaine. R. 230. As to alcohol use, the assessment indicated that the Claimant admitted to drinking beer the previous night, but said he "may have a beer or two on the week end and then none for two weeks." R. 230. As to the Claimant's "mental status exam," this assessment noted that his interview behavior was "overly dramatic." R. 231. Unlike the previous assessment in October, this assessment indicated that the Claimant did not have suicidal thoughts. R. 231. This assessment increased the Claimant's GAF to 55. R. 232. This assessment concluded by noting that the Claimant was being referred to substance abuse treatment and that he would not receive a mental health screening before completing that process. R. 233. Upon being notified of this process, the Claimant became defensive and irritable and requested to see another staff member. R. 233. Although the Claimant was scheduled for a mental health assessment on November 16, 2005, he was informed that he would need to complete substance abuse screening first. R. 233.

On November 16, 2005 – the date the Claimant was scheduled for a mental health assessment – the Claimant was a "no-show." R. 234.

On December 6, 2005, Richard Parsons, LCPC/LPHA, of the Janet Wattles Mental Health Center, completed a mental health assessment of the Claimant. R. 244-50. The Claimant was referred to the Health Center by the Public Defender's Office because the Claimant had recently been charged with felony driving after revocation. R. 244. The assessment noted that the Claimant attended the Verdi Club[3] where he played bocce ball and had a few friends and "a lot of acquaintances." R. 245. The assessment found "no evidence of any psychosis, hallucinations, or delusions." R. 245. Additionally, the Claimant's "memory for immediate, recent, and typically for remote issues [was] intact." R. 245. The assessment found that the Claimant was inclined to "rationalize his behaviors and to thereby justify breaking the law." R. 246. The assessment noted the Claimant's work history, stating that he frequently quit jobs and on occasion had "been fired from jobs for reasons he typically describe[d] as being unfair." R. 244. According to the assessment, the Claimant gave "an account of jobs he . . . had and the reasons why he quit the jobs – it seems he . . . never maintained a job for more than four years." R. 246. The assessment stated that the Claimant "seem[ed] to always quit for reasons that are good to him but might seem imprudent for most people." R. 247. Similarly, the assessment noted that the Claimant lost a recent job because he failed to go to work for a few days when he had the flu and relied upon a friend to

---

[3] The Verdi Club is an Italian men's social club on the Rock River in Rockford, Illinois. See www.rockfordverdiclub.com.

communicate that to his employer. R. 247. The assessment also noted that the Claimant claimed to have "been involved in a lot of busy activity at home helping his mother clean up her house and sort things about for Goodwill and the Salvation Army." R. 246. The assessment also referred to the Claimant's legal problems including "felony charges for repeated driving after revocation of his license." R. 247. The assessment also described the Claimant's substance use and abuse. According to the assessment, "The client admits that he smoked pot in high school and that he has made use of beer throughout his adult life, but denies that he abuses beer." R. 247. Although the Claimant denied purchasing cocaine, he admitted to using it and said he would not refuse it if offered. R. 247. The assessment referenced that the Claimant had previously admitted to using cocaine as recently as November 2005. R. 247. With regard to his physical health, the assessment discussed the Claimant's back problems. The assessment noted that he had seen a chiropractor regarding his back injury and that the "adjustments seem[ed] to help." R. 248. For diagnostic impressions, the assessment noted that the Claimant was suffering from bipolar II disorder and personality disorder not otherwise specified. R. 249. The assessment indicated a GAF of "50/78". R. 249.

On January 10, 2006, a psychiatric evaluation of the Claimant was completed by Dr. Uma Srivastava of the Janet Wattles Center. R. 238-39. The Claimant had been referred for the evaluation by the court hearing his traffic violation. R. 238. The Claimant again described his mood swings and his belief that he might have bipolar disorder. R. 238. Despite his previous assessments, the Claimant denied

currently using cocaine. R. 238. As to employment history, the evaluation states the following: "The patient has had various jobs including wanting to have his own business but he does not get along with people or gets quite irritated or manic which is why he loses his jobs." R. 238. As to the Claimant's mental status, the evaluation provides the following: "Young man neatly dressed. Alert and oriented to time, place, and person. Speech coherent and goal directed. Mood is not depressed. Affect appropriate to ideation. Comes across as fairly intelligent. Denies hallucinations or delusions. Not suicidal, not homicidal. Seems to have good insight and judgment." R. 238. The evaluation gave the Claimant a current GAF of 50. R. 239.

On February 14, 2006, Dr. Srivastava completed a psychiatric medication monitoring form. R. 237. According to Dr. Srivastava, since the Claimant was put on Geodon he was feeling a little better, and was "not as high or low." R. 237. As to the Claimant's mental status, Dr. Srivastava wrote the following: "Comes across as alert and oriented to time, place, and person. Speech coherent and goal directed. Mood is not depressed. Affect appropriate to ideation. Not manic, not psychotic. Seems to have good insight and judgment." R. 237.

Finally, on April 26, 2006, counselor Teresa Salvig wrote that the Claimant was diagnosed with bipolar disorder and had been prescribed Geodon. According to Ms. Salvig, the Claimant successfully completed group and individual counseling. R. 271.

### 3. State Agency Consultant Records

The record contains reports from three (3) state agency consultants. These documents address the Claimant's back problems as well as his mental health. According to a December 22, 2005 psychiatric review by Dr. Ronald Haven Ph.D., the Claimant possessed a "medically determinable impairment" that did "not precisely satisfy the diagnostic criteria;" namely, bipolar disorder not otherwise specified and mood disorder not otherwise specified. R. 254. He also found that the Claimant was polysubstance dependent with a history of cocaine use. R. 259. According to Dr. Haven, the Claimant had at most mild difficulties in maintaining concentration, persistence or pace, and no limitations on daily living activities or maintaining social functioning. R. 261. Dr. Haven concluded that the Claimant's mental health impairments were non-severe. R. 263. The record also includes a report dated January 21, 2006 by Dr. Kamlesh P. Ramchandani, M.D., in which Dr. Ramchandani states that the Claimant's physical examination showed that his gate was normal and unassisted, he was able to squat and get up from a squatting position without assistance, was able to get on and off the examination table without assistance and able to dress and undress himself without assistance. He also found that the Claimant's range of motion in his joints were full and normal except for his right leg and lumbar spine. R. 266. Dr. Ramchandani's impression was that the Claimant had "lumbar arthralgia secondary to discogenic disease of the lumbar spine." R. 267. Dr. Arjmand Towfig, in a January 25, 2006, "request for state agency medical consultant advice" concurred in the determination that the

Claimant's impairments were not severe.  Thereafter, on May 23, 2006, Dr. Marion Panepinto concurred with Dr. Towfig's assessment that Claimant's impairments were not severe.  R. 275.

D. Documentary Evidence

In various agency documents contained in the record, the Claimant made statements about his physical and mental condition.  These statements included the following.

Despite the Claimant's assertion that there were many activities that he could no longer perform, in December 2005, he admitted to performing the following household chores: cleaning, vacuuming, dusting, laundry, repairs and yard work.  R. 148, 150.  He also stated that he would go fishing once or twice a year but that it was difficult to get in and out of the boat or sit for long periods of time.  R. 153. Similarly, in May of 2006, the Claimant admitted to picking up after himself, loading the dishwasher, and shopping for groceries once a week. R. 165.  At that time, he also said that he never or rarely drove because he had no driver's license. R. 168.  In May of 2006, in contrast to his reported activities in December 2005, the Claimant indicated that he often gardened and fished.  R. 168.

E. ALJ's Decision

First, the ALJ found that the Claimant met the insured status requirements of the SSA through March 31, 2010. R. 61, 63.  Second, the ALJ found that the Claimant had not engaged in substantial gainful activity since September 26, 2005, the alleged disability onset date. R. 63.  Third, the ALJ found that the Claimant had

the following severe impairments: bipolar disorder, narcissistic and antisocial personality disorder, polysubstance abuse and lumbar degenerative disc disease. R. 63. Fourth, the ALJ found that these impairments did not meet or equal one of the listed impairments. R. 63-64. Fifth, the ALJ found that the Claimant had a residual functional capacity as follows: The Claimant could perform light exertional work that is unskilled, routine and repetitive so that it requires little judgment and infrequent interactions with others, subject to only occasional bending, stooping, squatting and kneeling, which work could only be on level surfaces and away from unprotected heights, hazardous equipment and operating machinery. R. 64. In making its residual functional capacity determination, the ALJ found that the Claimant was not credible. R. 64. In doing so, the ALJ applied the factors enumerated in 20 C.F.R. §404.1529(c) and §416.929(c).

## II. LEGAL STANDARDS

A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical

review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).[4] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief."). An exception to the *Chenery*

---

[4] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano*, 556 F.3d at 562. But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

doctrine is the harmless-error doctrine, which allows a court to affirm if the outcome on remand is foreordained. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."); *see Osmani v. INS,* 14 F.3d 13, 15 (7th Cir. 1994) (harmless error does not require remand "when it is clear what the agency's decision has to be"); *Sahara Coal Co. v. Office of Workers' Compensation Programs*, 946 F.2d 554, 558 (7th Cir. 1991); *see also Parker*, 597 F.3d at 924. The harmless error analysis looks to evidence in the record to see if the court can predict with great confidence what the result will be on remand. *McKinzey*, 641 F.3d at 892.

B. Disability Standard[5]

Disability insurance benefits are available to a claimant who can establish that he is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education and work experience, participate in any gainful employment that exists

---

[5] Although Plaintiff also sought supplemental security income, because the analysis is the same for both, the Court only addresses the ALJ's finding as to disability. *See Blackwell v. Barnhart*, 258 F. Supp. 2d 851, 860 (N.D. Ill. 2003) ("The substantive requirements for SSI benefits are substantially the same as those for Social Security disability benefits under Title II of the Social Security Act."). Moreover, the Claimant never addressed supplemental security income in his briefs.

in the national economy.  42 U.S.C. §423(d)(2)(A).  Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized.  20 C.F.R. §404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v).  Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740.  After the claimant has proved that she cannot perform his past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for four (4) reasons.  First, the Claimant notes that the ALJ included the much criticized

boilerplate language found in nearly every ALJ opinion.  Second, in his opening

brief, the Claimant argues that the ALJ improperly discounted the opinion of his

chiropractor "without contradictory medical evidence." Dkt. #15 at p. 1.  In his reply

brief, the Claimant pivots from this argument and asserts that the ALJ improperly

discounted the chiropractor's opinion "solely based on the non-examining state

agency consultants." Dkt. #21 at p. 1.  Third, the Claimant contends that the ALJ

improperly discredited the Claimant's testimony.  Finally, the Claimant contends

that the ALJ failed to properly consider his GAF score.  It is important to note the

issues that the Claimant has not raised.  At least three of these are identified below.

Moreover, the Claimant does not argue that the ALJ failed to adequately develop

the record.

The Commissioner contends that the ALJ conducted a proper credibility

analysis, and that the Claimant simply failed to meet his burden of showing that he

was disabled.  The Commissioner asserts that the Claimant is improperly asking

this Court to re-weigh the evidence.

B. Analysis

The ALJ mainly focused on the credibility of the Claimant, and the other

issues raised follow from the ALJ's decision in this regard.  Accordingly, the Court

will address the credibility analysis first.  The Court will then address the issues

relating to the chiropractor's testimony, and then the Claimant's bipolar disorder.

1. The ALJ's Credibility Analysis Was Not Patently Wrong

The Social Security Administration regulations provide the framework for making a credibility analysis. 20 C.F.R. §1529.404. The ALJ's first step is to determine whether the claimant has a medically determinable impairment.  If the claimant has that type of impairment, then the ALJ must evaluate the intensity and persistence of the symptoms to determine how those symptoms limit the claimant's capacity to perform work. 20 C.F.R. §404.1529(c)(1).  In determining the claimant's symptoms, including pain, the ALJ must consider objective medical evidence, but cannot stop the analysis at that point.  Instead, the ALJ must consider other factors, such as the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain; the treatment, including medication, the claimant receives to relieve the pain; measures the claimant has used to relieve the pain; and any other factors relating to the claimant's functional limitations.  20 C.F.R. §404.1529(c)(3)(i) – (vii).

The ALJ performed this analysis in detail and determined that the Claimant's assertions as to intensity, persistence and limiting effects were simply not credible.  R. 64 – 66.  The ALJ did not err in this regard, particularly when viewed from the proper standard of review; namely, whether the ALJ's decision was patently wrong. *See Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004).

As noted above, an ALJ may not ignore subjective complaints of pain *solely* because they are unsupported by medical evidence, but it does not follow that an

ALJ is therefore obligated to accept the claimant's complaints at face value. *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). Social Security claimants are like any other party to litigation and may exaggerate when it is to their advantage. *Adams v. Astrue*, 880 F. Supp. 2d 895, 905 (N.D. Ill. 2012). Accordingly, the ALJ – and courts – can consider discrepancies between objective medical or other evidence and self-reports that contain evidence of exaggeration. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). In addition to the factors identified in the regulations, ALJs and courts can use ordinary techniques to evaluate credibility, including prior inconsistent statements and lack of candor in other aspects of the claimant's testimony. *Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

In this case, the ALJ applied the regulatory factors and other evaluative techniques in determining that the Claimant's testimony regarding intensity and persistence of pain was not credible. First, the ALJ noted that despite the Claimant's assertions of intense lumbar back pain, the Claimant only took over-the-counter analgesics. R. 67. This is a proper factor, and is supported by the record evidence. 20 C.F.R. §404.1529(c)(iv); R. 23-24.

Second, the ALJ considered the Claimant's daily activities. Again, this is a proper regulatory factor to consider. 20 C.F.R. §4041529(c)(i).[6] With respect to daily activities, the ALJ noted – again contrary to the Claimant's assertions of

---

[6] It is important to note that the ALJ was not using the Claimant's daily activities as a way to indicate that the Claimant was capable of working full time. Instead, the ALJ was simply contrasting the Claimant's previous statements of his daily activities against his testimony of daily activities to determine the Claimant's credibility.

debilitating pain, which prevented him from doing anything other than shuffling around the house – the Claimant stated on his mental health assessment that he was busy helping his mother clean her house and sorting through items to send to charity. R. 66, 246. Likewise, although the Claimant testified at the hearing that he no longer shopped, in agency documents he repeatedly indicated he did so. R. 165. Similarly, despite asserting that he no longer drove, the evidence conclusively established that the Claimant was in legal difficulty for recently driving without a license. R. 244. Finally, the ALJ noted that contrary to the Claimant's assertions that he was a recluse that never left the house, the record reflected that the Claimant went to the Verdi Club, where he had friends and many acquaintances, to play bocce ball. R. 66. Once again, the ALJ's finding was supported by the record. R. 245.[7]

Third, the ALJ considered how the Claimant responded to treatment. R. 65. Again, this was a proper regulatory factor for the ALJ to consider. 20 C.F.R. §1529(c)(v). As to the Claimant's back pain, as the ALJ noted, the Claimant's own chiropractor – upon whom the Claimant places so much reliance – wrote that the Claimant's back problems responded well to treatment. R. 65. The record supports the ALJ in this regard. R. 236. As to the Claimant's bipolar disorder, the ALJ found that the Claimant's counselor indicated that he had completed both

---

[7] The record contains additional activities that contradict the Claimant's assertions as to severity. For example, the record shows that the Claimant also did yard work, gardened and went fishing. R. 148, 150, 153, 168. It is easy to see why the ALJ found the Claimant not credible.

individual and group therapy, and was feeling better and no longer depressed.  R. 66.  Once again, the ALJ's finding was supported by the record.  R. 271.

Finally, in discrediting the Claimant, the ALJ noted the substantial conflict between the record evidence and the Claimant's vehement denial of drug use.  R. 66.  Again, the ALJ rightfully considered this fact, and the fact is supported by the record.  Indeed, the Claimant's purported explanation as to why the records were inaccurate is incredible.  R. 36-37.  The Claimant testified that the counselor must have included the allegedly false information in his records because he complained about her.  R. 36-37.  Besides the fact that this explanation is highly implausible, it does not explain the fact that the information regarding the Claimant's drug use was noted twice by two different counselors on two different occasions.  R. 225, 229, 247.  Additionally, his explanation does not address his failure to correct the purported egregious act before the hearing.  Finally, the Janet Wattles Center records all indicate that whenever drug use was addressed with the Claimant he became defensive.  R. 230.  The transcript of the hearing before the ALJ indicates that the Claimant likewise became defensive with the ALJ when he raised the issue.  R. 36-37.

The Claimant essentially ignores all these factors and the ALJ's analyses of these factors.  Instead, the Claimant argues that the ALJ was somehow duty-bound to find him credible.  The Claimant is wrong.  The Court does not re-weigh credibility.  Instead, the Court, as a reviewing body, determines whether error

occurred below.  Upon review, the ALJ's credibility analysis was not "patently

wrong." Indeed, the analysis was fully supported by the record.[8]

### 2. The ALJ Properly Evaluated the Evidence Provided by the Chiropractor.

As the ALJ correctly noted, the record is comprised mostly of documents

relating to the Claimant's mental condition.  R. 65.  The Claimant, nevertheless,

places great – indeed, almost complete – reliance on a single note, dated February

27, 2006, from his chiropractor, Dr. Papke.  R. 270. (The only other evidence was

provided by a state-agency consultant regarding decreased lumbar flexion and the

Claimant's difficulty performing a straight-leg raise. R. 266.)  Ironically, the note is

written on a "return to work" form.  As stated above, in total, the note provides that

the Claimant can return to light work, but restricts the Claimant's work as follows:

"No repetitive bending, twisting, or lifting or anything greater than 5 lbs."  R. 270.

This "return to work" note makes no mention of Dr. Papke's other document in the

file, dated about three (3) months earlier, that stated the Claimant responded well

---

[8] Regarding credibility, the Claimant correctly notes that the ALJ used boilerplate language that the Seventh Circuit has repeatedly and emphatically criticized.  *See, e.g., Bjornson v. Astrue*, 640, 644 (7th Cir. 2012).  (Why the ALJs continue to include this boilerplate language is baffling.  The Commissioner asserts that she includes this language because it is contained in the "agency's decisional templates" and is used for about 800,000 hearings. Dkt. #20, p. 7. If this language is simply in a template, then the agency can simply remove it from the template, thereby eliminating the error altogether.  And asserting that the error is repeated nearly a million times a year does not make the error any less of an error – just the opposite, that action compounds the error nearly a million fold.)  But as the Commissioner correctly notes, the inclusion of this boilerplate language does not automatically require reversal.  *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).  Provided that the ALJ provides reasoning for not crediting a claimant's testimony, an ALJ's erroneous use of this boilerplate is harmless.  *Id*.  As shown above, the ALJ provided more than enough reasoning to overcome the inclusion of the erroneous boilerplate language.

to treatment and was seen on an as needed basis.  R. 236.  The Claimant's brief, like nearly all the record evidence contrary to his position, ignores this document.

The Seventh Circuit recently addressed an ALJ's credibility determination based upon a treating chiropractor's opinion.  In finding that the ALJ did not err, the Seventh Circuit stated the following:

> For purposes of social security disability determinations, a chiropractor is not an 'acceptable medical source,' cannot offer 'medical opinions,' and is not considered a 'treating physician. . . An ALJ may consider a chiropractor's opinions, of course, but the weight they will be given will depend on a number of factors, including the degree to which they are supported by objective evidence.

*Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (citations omitted).

An ALJ cannot discount a chiropractor's opinion merely because it is the opinion of a chiropractor.  *Losquardo v. Astrue*, 2012 U.S. Dist. LEXIS 135703, *42-45 (E.D.N.Y. 2012).  Instead, the ALJ must consider the chiropractor's opinion as evidence from an "other source."  SSR-06-03p (in addition to acceptable medical sources, the agency may use evidence from "other sources" including chiropractors).  In determining what weight to give to "other medical evidence," like a chiropractor's opinion, the ALJ has more discretion and is permitted to consider any inconsistencies found within the record.  *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2004).

Initially, the Claimant argued that the ALJ erred by discounting Dr. Papke's opinion "without contradictory evidence."  Dkt. #15, p 1.  However, after the Commissioner established that the ALJ relied upon the opinions of the state-agency consultants and physicians, the Claimant messaged his argument.  In his reply

brief, the Claimant argued that the ALJ could not rely "solely on the non-examining state agency medical consultant's opinion." Dkt. #21, p. 1.

The Claimant's argument is without merit. First, the Claimant cites no authority that forbids an ALJ from relying upon state-agency consultants' opinions to reject a treating chiropractor's opinion. Despite extensive research, the Court was unable to find any controlling authority supporting this proposition. In fact, the Court found contrary authority, which upheld an ALJ's decision to follow two state-agency non-examining physicians instead of a treating chiropractor. *Makenzie v. Comm'r of Social Security*, 2010 U.S. Dist. LEXIS 118536, *26-30 (S.D. Ohio 2010) *report and recommendation accepted* 2010 U.S. Dist. LEXIS 118535 (S.D. Ohio 2010). Second, case law allows ALJ's considerable discretion in determining what weight to give to "other source" evidence. Third, the Claimant's argument essentially seeks to establish a per se rule that a treating chiropractor's opinion – however scant that opinion is, like in this case – trumps multiple state-agency consultants' opinions. Indeed, the Claimant asks this Court to ignore the state-agency consultants' opinions, which this Court cannot do. *See* 20 C.F.R. §404.1527(e)(2)(i) ("Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled.")[9]

---

[9] The Claimant does not argue that the ALJ erred by failing to apply the "checklist factors" found in 20 C.F.R. §404.1527(d) to determine the weight to give to Dr. Papke's opinion. But even if the Claimant made this argument, the Court is not sure it would prevail. The ALJ *can* consider these factors. SSR 06-03p. However, nothing in the regulations, policy

In addition to the state-agency consultants, the ALJ also relied upon Dr. Papke's November 30, 2005 document. As noted above, and as found by the ALJ, this document stated that the Claimant responded well to treatment and exercise. R. 65, 236. This conflicting evidence provides an additional basis for the ALJ to discount the chiropractor's opinion, which the ALJ did.

Finally, the ALJ relied upon the paucity of medical evidence the Claimant presented. And when a claimant is represented by counsel, as the Claimant was here, the ALJ is entitled to presume that the record will be adequately developed. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) ("a claimant represented by counsel is presumed to have made his best case before the ALJ"); *Hawkins v. Chater*, 113 F.3d 1162, 1167 (7th Cir. 1997) ("Thus, in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development."). No request to further develop the record was made below and no argument that the ALJ failed to fully develop the record was made to this Court.

### 3. The ALJ's Decision Was Not Erroneous with Respect to the Claimant's Bipolar Disorder.

The Claimant makes two (2) arguments as to why the ALJ erred with respect to his bipolar disorder. Neither has merit.

First, the Claimant focuses on his GAF scores of 50. Dkt. #15, p. 4; R. 227. (The Claimant ignores the GAF scores of 78 and 55.) Based upon that GAF score, the Claimant leaps to the conclusion that he is unable to perform the work

---

interpretations or controlling case law the Court has seen *mandate* that these factors be considered in the same way they must be used when weighing opinions from "acceptable medical sources." Perhaps ALJs should consider these factors, and it would make sense to do so, but currently the Court knows of nothing in this Circuit that requires ALJs to do so.

identified in the ALJ's RFC. The Claimant's over-emphasis on his GAF score of 50 (even ignoring the GAF scores of 55 and 78, for sake of argument) is misplaced. As the Seventh Circuit has stated, "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). In fact, courts have rejected nearly identical arguments in cases involving GAF scores of 50. *Schnittker v. Colvin*, 2013 U.S. Dist. LEXIS 140065, *8-9 (S.D. Ind. 2013) (affirming denial of benefits for claimant with GAF score of 50). Moreover, the ALJ did not consider the GAF score in a vacuum. Instead, the ALJ properly considered the GAF score in relation to the record, including the Claimant's other GAF score of 78, his successful completion of both group and individual counseling programs, and his statements that he was feeling better and stable while taking Geodon. R. 66.

Second, the Claimant asserts that the ALJ erred by characterizing the Claimant's GAF scores as a "moderate" impairment. The Claimant asserts that a GAF score of 50 is a marked impairment. Dkt. #15, p. 4. The Diagnostic and Statistical Manual of Mental Disorders classifies a GAF score of 60 as moderate symptoms and a GAF score of 50 as serious symptoms. *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. 2000). In light of the circumstances of this case as well as the recent GAF score of 55 and two notations in the record of a GAF score of 78, the ALJ's use of the term "moderate" does not require remand under these particular facts.

Moreover, both of the Claimant's arguments fail to understand that the ALJ specifically incorporated the Claimant's GAF scores into the RFC.  R. 46.  Even with the inclusion of these scores into the RFC, Mr. Newman (the vocational expert) found that jobs existed that the Claimant could perform.  R. 47.  The ALJ relied upon Mr. Newman's opinion in his decision.  R. 68.

## IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.


It is so ordered.


Entered: September 16, 2014

**Iain D. Johnston**
**U.S. Magistrate Judge**